The next case this morning is in re the Marriage of Wetzler and Mr. Drazen, when you're ready, please proceed. Justices, Mr. Wilson, please report. My name is James Drazen. I represent Scott Wetzler in this particular case. This is a case of the Disillusion of Marriage case and I believe some of the facts need to be relayed to make my arguments a little bit more concise. The parties in this particular case were married not too long ago, in October 2005. During that time period, they resided up north up near Chicago. And approximately a year or a little over a year later, they decided to move down to this area, to the St. Craig County area specifically, so that they could be closer to Mr. Wetzler's other child, Madison, whom he refers to as Maddie. The parties moved down here. Shortly thereafter, in March of 2007, they had a child named Peyton. Peyton lived here with them all the way up until the time of separation. It's important to note, I think, that Scott's entire extended family resided very closely in this area. Also, Peyton, almost from birth, started establishing a relationship, not only with Madison, but with her extended family as well. Testimony and evidence show that not only did Peyton have a very, very close relationship with Madison, in fact, the respondent said she missed her greatly and she was extremely close to her, but she also established a very close relationship with her cousins, Kay and Reese. In fact, Kay was born only a couple of weeks apart from Peyton. So they just kind of grew up together or started growing up together during the time that the parties all resided together. At that same time, Scott took a very, very sincere and extensive interest in Peyton's upbringing. It starts with him taking him off several weeks when the child was born so he could stay home and take care of Peyton. Thereafter, Peyton was heavily involved in several activities. Those activities included swimming, dance, gymnastics, ultimately he ended up getting her involved in soccer, where he coached the soccer team as well. Those activities were also participated in by her cousins. They participated in those activities together, and they got together very often. Peyton's extended family went further than that, further than just the cousins and further than her sister Madison. It went to her grandparents and her aunts and uncles as well, all of them who lived in this area, tight-knit area of St. Clair County, Illinois, and she became very comfortable and very suited towards that type of a rural upbringing. She became very comfortable in that type of a rural upbringing. The party separated thereafter on about September of 2009, at which time Ms. Wetzler, the respondent, and the FLE herein moved back to northern Illinois. Mr. Wetzler stayed here, and the party started exchanging the child on a weekly basis. Up until that time, according to the testimony, it's unrebutted. In fact, it's the testimony of the respondent as well. They would exchange a relationship with Scott's extended family a week, sometimes several times a week, often getting involved in activities such as barbecues, trips to the ballgame, trips to the park, trips to the zoo, all those various activities. Shortly after separation, Mr. Wetzler met a young lady named Libby Neff, who he was engaged to at the time of crime. Libby also testified to her close relationship with Peyton and all the different things they did, both by themselves and with Scott and his extended family. So they established that type of a relationship early on. Contrast that, if you will, to the relationship or the environment that Peyton observed in northern Illinois up by Chicago. Ms. Wetzler moved in with her parents shortly after separation or at separation and continues to live there up through the date of trial. There aren't any other extended relatives who visit regularly. In fact, Ms. Wetzler brought some witnesses down who testified that they were sporadic in their visits. They were sometimes a couple of hours when they visited, and it didn't happen very often. So their closest relationship actually was with her grandparents, and it was interesting to note that the respondent's father testified, and at one point in time he testified that Ms. Wetzler was working overnights for the, I think it was the Justice Police Department as a dispatcher, and she would often be asleep still when he came home from work at approximately 5 p.m., and so therefore it left the child-rearing duties on that week-to-week time period to Ms. Wetzler's mother to take care of the child or her babies. So those types of situations weren't unusual from what had happened originally before Ms. Wetzler left this area. The testimony was that Ms. Wetzler worked a number of different jobs. She tried to go to school for a semester, and she quit that. She worked a job after she got out of cosmetology school. She got terminated from that quickly. She worked a job for the O'Fallon Police Department. She quit that after about six months. She had a lot of different jobs, but at one point in time, the parties decided they were going to get this home improvement business going, not home improvement, home inspection business going, and basically what will happen with that home inspection business is Ms. Wetzler was going to handle the phone calls, the administration, the sales, and Mr. Wetzler and his father would handle the actual home inspections. Mr. Wetzler's father came in and testified that he would come by late in the mornings to pick up his paperwork to handle those things, and he would find that Ms. Wetzler said, can't come upstairs because I'm still sleeping during that time period, and that's something that carried on even when she moved to Gus's. At the end of the case, the court entered a judgment, and in that judgment, it granted primary custody of the child to Ms. Wetzler and sent the child essentially to the Chicago suburbs on a permanent basis, only to be visited by my client on alternating weekends and alternating holidays some period of time during the summer. There was a guardian that I had also appointed in this case who rendered a report early in December of 2010 and then testified in trial in August of 2011. The issue before the court with regard to custody is were the factors set forth in Section 602 of the Illinois Marriage and Dissolution of Marriage Act actually applied in this case. And I realize and I agree with the respondent that the court doesn't have to actually elaborate all of those rules or all of those factors and how it actually applied. But pursuant to the cases which I cited, including COCA, I believe the court must have some evidence in the record to support an evaluation of those factors. It's our position, Justices, that the factors that apply in this particular case all favor overwhelmingly an award of primary custody to Ms. Wetzler. And I reviewed those four factors both in my appellate brief and today. The first factor that I would look at with regard to the 602 factors is the interaction and interrelationship of the child with parents, siblings, and others who significantly affect the child's best interest. In this particular case, Your Honor, there is no doubt. All the testimony showed that from the child's birth until the time mom left, almost all of the relationships were people down here, and they were close. They were close. She was very close with her sister. She's very close with her cousins. She's very close with her uncles and aunts. She's very close with her grandparents. And she became very close with Scott's fiance, Libby, who she came to know. And Libby testified, established an extremely close relationship with him. When you contrast that with the relationships she's established up north, it just doesn't match up. She has established certain relationships with her grandparents, but they testified, the mother's parents testified, they came down sporadically and visited, and that's all they had. No cousins came down. They very seldom went north to visit those folks. So she really didn't have a relationship with all those people. If you take a look at the relationship of the other parties that affect the best interest of the child, a factor which the legislature has found to be extremely important and certain case law that I've cited has also found to be extremely important, that factor overwhelmingly favors an award of primary custody to Mr. Wesson. The second factor that I addressed in my brief was the child's adjustment to homes, schools, and communities. I think that's closely related to the first factor because she was born and raised in her short life in the St. Clair County area. She had a relationship in this area. She went to the parks in this area. She was very comfortable in the petitioner's home in this area. She was very comfortable in the home of her aunt and uncle. She was very comfortable in the home of her grandparents. This is where she lived. This is where she found her niche, if you will, and the award of custody in this particular case, which removes her from that niche and places her in Northern Illinois, I think is clearly contrary to the best interest of the child and opposite to the manifest way to the evidence. There is zero evidence that this child had any type of a close relationship or a feeling of stability or continuity in Northern Illinois. And, again, while the circumstances indicate or the case law indicates that the court doesn't have to evaluate specifically in its order all of these factors, there has to be some evidence of the factors when the court enters its order. There's got to be some evidence in the record. There's no evidence of that in the record, Your Honors. There's none at all that would indicate that this child has either a close relationship with others up north or a close affinity to the homeschooler community in Northern Illinois. In fact, Mr. Westler put Peyton in preschool down here. Wayne got her her physical that she needed to get there and forwarded the physical up to Ms. Westler so she could get the child into school, preschool up in Northern Illinois. Until that time and without that physical, that child wouldn't have even gotten into preschool up in Northern Illinois. So Mr. Westler cooperated in that respect, and I'll get to that point later on as my fourth factor. The third factor, Your Honors, that I think is important is the mental health of the parties. The guardian ad litem who was appointed in this case identified and Mr. Westler testified in trial that Ms. Westler was extremely depressed when this case was going on. The guardian ad litem went so far as in her report that she filed in December to say that when she first met Deanna, she was suffering through a very serious bout of depression, which she'd allowed to continue over for many months without recognition or treatment, and this depression interfered with her ability to care for Peyton. That, Your Honors, is exactly the standard which the legislature adopted when they say you've got to evaluate the mental health of the parties, and it's the standard that the Prince case adopted or looked at when it said you've got to look at the mental health of the parties and their ability to, the detriment to the child by that mental health problem. One of the things the GAL pointed out was one of the effects that depression had on Ms. Westler here was that she could sleep for long periods of time. Ms. Westler's own father testified that when she moved up there, she was doing the exact same thing. Testimony evidence showed she stopped taking her medication, and she did that without the advice of her physician. She did it on the advice of some counselor or therapist that she had been seeing and just simply stopped taking her medication. It is that issue, Your Honors, that I think leads to my next point, and that is there is a serious discussion in both briefs regarding, and a lot of discussion at the trial, for that matter, regarding this video that Ms. Westler took of her child doing a rap song that had tremendously bad lyrics. I'll agree there were two different types of lyrics that were set forth in the exhibits. It doesn't make any difference which one. It was terrible. The guardian ad litem said she'd been making some dumb decisions, and she said that was really a dumb idea to, A, take the video, and then, B, post it on Facebook. It doesn't come down until, according to the guardian ad litem, until the guardian ad litem tells Ms. Westler that was really a dumb idea. Then she takes it down. This is the mental health situation that I think the legislature was looking at when they said you need to evaluate those circumstances. There was absolutely zero question about Mr. Westler's health, mental health, or his physical health. There was no testimony, no evidence on it. That factor clearly weighs in favor of an award of custody to Mr. Westler. The final factor we looked at was the ability of the proposed custodial parent to promote a relationship between the child and the non-custodial parent. I pointed out to the justices earlier that Mr. Westler went to great lengths to make sure that the physical that he obtained on his own, he sent up to Ms. Westler so she could use it. Ms. Westler's own testimony was that there were several times that she needed to adjust her schedule and Mr. Westler didn't follow. She admitted on cross-examination that there were times that Mr. Westler wanted to adjust it, and she did not. Mr. Westler went into great lengths on that. Even in spite of all of that, the guardian ad litem pointed to two factors which she said merited a recommendation that the mother should have primary custody. One, Mr. Westler's crazy work schedule. He's working all these hours of overtime, he's on a call all the time. When he got to trial, determined that that's not accurate, that he's working closer to 36 hours a week. He's giving some additional time, but he's taking it as comp time, so he takes additional time off. She admitted that perhaps she had gotten those numbers which she got from the responder and evaluated them incorrectly. The other issue that she said merited an award of primary custody to the mother was she didn't think that the father, Mr. Westler, respected the mother. I asked her to give me an example of that, and she couldn't give me it. She said it was just a feeling she got from the way she had discussions with Mr. Westler. I asked Ms. Keatland, the GAL, about these different things that he had done to promote the best interest and welfare of the child with regard to the proposed non-custodial parent, Ms. Westler. And Ms. Keatland's answer was, well, he's doing it for his own self-interest at this point in time. He's trying to look good for the court. I would submit to the justices that if that's the case, that particular factor has to come out of the statute because that's the whole idea behind the statute is will you promote the best interest of the child when it comes to the proposed non-custodial parent. The only testimony we've got and the only evidence we've got of anybody doing anything for the other party was Mr. Westler working with Ms. Westler, even on the day before trial, to give her additional time with the child when it was his time. And when he asked for some reciprocation from her, she said no. This factor also weighs heavily in favor of an award of custody to the petitioner, Mr. Westler. If you can't find any information in the record that the court evaluated these factors and they weighed in favor of the respondent, then I think this court is obligated because the manifest weight of the evidence so grossly outweighs an award of custody to Ms. Westler that this court must reverse. We're asking this court to reverse this decision of the lower court and remand it to the lower court with the directions to appoint Mr. Westler as the primary custodian. Thank you. Okay. Ms. Wilson. Good morning. Justices, Mr. Grayson, may I please support? My first impression as I stand up here before you is I wonder what trial he was attending because the facts that were in evidence at the time of the trial are not in any way overwhelming. Like he said, in fact, keeping this matter in perspective, the child was 2 years old when the parties separated. They were separated from September of 09 to the trial was in September of 2011. So during the period of time, during that 2-year separation, the child spent half her time in Chicago living with her grandparents on a day-to-day basis with her mother and the other half of the time down here in the Belleville area living with her father. But during the same period of time when she's living with her father, the father is working many, many nights over time. His job called for weekends. His job called for long periods of time when this brief time that he has the child, because they're doing 50-50, he's often working. The child is staying with his fiance, staying with a grandparent or someone else. During the time that the child is in Chicago, the child is with mom and grandparents 100% of the time. There was one time they said there might be an hour here or there that the child wasn't with grandparents and mom. What you also have to keep in mind, keeping everything in perspective, is mom was a stay-at-home mom for the first year of the child's life. Dad was a state policeman going up, up, up, up in his professional career. During the last 3 years, the income information that we had, he went from about $69,000 a year to he was on a scale to go up to about $80,000 at the end of the trial. This is what his job was. This is his profession. This is what he lived for. The testimony of my client was he was very professionally driven, very do-the-job, do-the-overtime, do-the-everything. Well, my client is the one staying at home and taking care of the child solely for the first year, although there was a couple weeks at the beginning that he stayed home. She testified even then, he said he got up with the child in the middle of the night. She was breastfeeding, and she said that didn't happen, and his exaggerations about what he did even during that time were great. But the bottom line in this matter is the court looked at a number of factors, and Mr. Drazen has enumerated a number of those factors. But I think the most important factor, first of all, I don't believe that there's any concern about the court reviewing the factors. It said specifically it had looked at all of the factors under 602. It examined all of the evidence, and the evidence is replete with information about those categories. And the one category I think sticks out the most is the category, section number 8 under 602. Will the parent facilitate a relationship with the other parent if that parent is given custody? At the beginning of this trial, there was a guardian ad litem chosen, and that guardian ad litem, Ms. Keeblin, was chosen for a very specific reason. There had been allegations by Mr. Drazen of depression on the part of my client. And in fact, my client had admitted that due to his demeaning manner to her, due to his controlling manner, due to his totally shutting him out of his life and anything to do with self-respect to her, she had become depressed about the time of the separation of the parties. However, when she went to Chicago with her family, which, by the way, had always been contemplated, there was a prenuptial agreement, and the court found this to be very weighty. The prenuptial agreement had always anticipated that the parties would return to Chicago. It wasn't a maybe, it wasn't a if everything works out okay, it wasn't if I agree. It had always been that the parties would return to Chicago. When my client asked to return to Chicago per the prenuptial agreement, Scott refused. He then started being demeaning to her. He was very non-respectful to her, and as a result of that, her depression became bad. So she goes to Chicago, she gets a therapist. The guardian ad litem says her depression was short-lived. As soon as she got to a support group, as soon as she got with a counselor to understand why I'm feeling the feelings I'm feeling, she wasn't depressed anymore. We chose the guardian ad litem for the reason that she was formerly a counselor, she had a big background in this kind of issues, and I think her opinion in this is very persuasive. But I will tell you Judge Kelly, who is the judge in this case, has made it very clear, unlike a lot of judges, he doesn't rubber stamp what the GAL says. He wants to make his own opinion about what's going on. In this particular case, he said in his opinion that the respect for Mrs. Wetzler was not there. He concurred with what the guardian ad litem said, that there would not be a facilitation of the relationship if Mr. Wetzler were to be given custody. And he found that, along with her, that the depression was not an issue. In fact, when the guardian ad litem gave all of Scott's family an opportunity to say, tell them about the depression, not one of them said anything about any depression. The incident where Mr. Wetzler's father wanted to go upstairs in the family home when he came over, Mrs. Wetzler testified, she goes, it wasn't that I was sleeping. It's that our bedroom. I don't think he has any right to be upstairs in our bedroom area and be looking around and seeing what's going on. That's our private home. Her father said it was an isolated incident. He said there was one time when he had come home that she had slept until 5 o'clock. Isolated incident. He, in fact, said she was very much hands-on with regard to the relationship with her daughter. But he, and this is where I say I don't know if we're at the same trial, Mr. Dina Wetzler's father, when he testified about the child, he glowed. He almost cried. He said, that's my buddy. I love her. We do everything together. Our relationship is so solid. Grandma and Grandpa, Dina's parents, live with this child every day. He said that she had no relationship with anybody in Chicago. The trial testimony and, by the way, the observations of the court with regard to that testimony was overwhelming that the relationship that Dina and Dina's parents and Dina's family had with this child was overwhelmingly close. And you've got to keep in mind, he keeps talking about the relationship down here in this area. The child was only two years old. The child is barely potty trained. The child is barely forming words when she goes to live half-time in Chicago. And so to suggest that this child is going to be somehow totally disrupted by a move to Chicago, which was always contemplated in which she had been there for the last two years, is ludicrous. With regard to the other statements with regard to Mr. Wetzler and his family, he has a good family. And that's the good thing about this trial. Both families indicated the grandparents are good people. All of them are good people. They said, with the exception of some of Scott's testimony, they said the parents are good people. We have two very good parents. This gets down to a balancing act. And the court found in the end that the balancing act was in favor of my client, who had been a stay-at-home mom, who had been a consistent one there, who had been the one, even though she worked overnight, one of her shifts in Chicago was overnight, she got up in the morning, she took the child to preschool or she played with the child until preschool. She was there 24-7. She was very close. She was not depressed at all the last year and a half of this case. And everything pointed to her being the person that was going to facilitate a relationship. She, in fact, had done that, and she was going to be the one to continue doing that. And the court, who saw firsthand evidence of the testimony, the credibility of the parties, and, again, looking at the guardian ad litem's report, I believe the facts were overwhelming in favor of my client. With regard to Mr. Wessler's family, they had spent time with the child, and they did come over during the week. But his, Mr. Drazen's testimony that my client's family was there intermittently or almost never, the testimony was they were there at least once a month, if not more often. They stayed for days at a time when they came down. To say they were there for a couple hours is totally disrupting what the testimony at the time of the trial was. I believe in this particular case that the court looked at two good parents, two good families, looked at what parties had contemplated at the time when they got married, looked at the career-driven basis of Mr. Wessler, and the fact that my client was the stay-at-home mom, she was the nurturing one, she was the one that cared for this child on a regular basis. I think the court chose wisely, and his opinion should be affirmed. With regard to this video thing which came up, and the guardian ad litem specifically said much ado about nothing. But if you look at the video, this is another attempt at Mr. Wessler to distort the facts. The video was the video that my client had gotten from his daughter, Mr. Wessler's daughter, the one, Madison, that lived here in the area. He overreacted, gave the song to the guardian ad litem before looking at what the lyrics really were, and there were two versions of the lyrics. It turned out the version was the clean version. The version was the appropriate for children version. The version that they got was the version that they got from Mr. Wessler's daughter, Madison, and not something that my client decided to do. In the end, it was determined he overreacted, much ado about nothing, and in fact was, as in many things to do with this case, he jumped at whatever piece of evidence or trial evidence he could try to get to make my client look bad, which more or less reiterated the feeling that the guardian ad litem and the trial court had that he would do everything he could to disrupt the relationship of my client with the child if he were given the control in this situation. Mr. Drazen did not address some of the financial issues, but again, I think those facts are overwhelming. The financial issues clearly show that the court gave my client some financial help in this case. We have over $17,000 or $18,000 in attorney's fees. He awarded $3,000 in attorney's fees to her. Her income in 2009 was zero. In 2010, it was $15,000. If everything went well in 2011, she was going to make $36,000, whereas Mr. Wessler's income had gone from $69,000 to was on a scale to go up to $80,000 at the end of the year of the trial. Plus, during the prenup, Mr. Wessler had asked Mrs. Wessler to waive any rights to his pension and had asked her to waive any rights to maintenance, which when it came down to the trial, because the prenup was considered to be valid, she had no pension, none of the rights to the five or six years of pension she would have gotten. She had no maintenance despite the great disparity of income, and she had three years of almost no income compared to Mr. Wessler's substantial income and substantial benefits during that three-year period. So what little help the court did give my client, which was very little compared to how much was spent and what the issues were here, I think it was more than justified. And in fact, I figured that the child support, the 20% child support, should have been a little more than it was figured. He admitted that the money on his financial affidavit was underestimated based on his gross year to date. He admitted he had overwithheld on state taxes. He admitted he had overwithheld on federal taxes. He admitted that he worked overtime, $55 an hour, and had done that often in that year. He admitted he didn't calculate any overtime into that financial affidavit. So if you look at the financial situation as a total, and if you even look at the specific financial situation as testified to, not what's unnecessarily on his financial affidavit, I believe everything to do with the finances should be upheld by the court as well. Do you have any questions? No. Thank you. Thank you. Revital? I have. Ms. Wilson indicated that the judge and the GAL both found that the mental health issues were not a factor in this particular case. The judge refers to the factors in paragraph 17 of his findings. He says the court considered all the testimony, all the answers, has considered all the statutory factors with regard to 503 regarding disposition of property and 602 regarding the determination of custody of the position. That's it. That's the only statement he makes. When Ms. Wilson says he determined that that wasn't a factor, that's the statement. That's the only statement that's ever made. So to say that he concurred that there was much to do about nothing is incorrect. In fact, when Ms. Keeble was testifying about it, about this video that Mom put on Facebook, and she said she agreed that it was really dumb for her to do that, the judge asked her, can you understand the father's position in this? And Ms. Keeble said, oh, absolutely. I'd be upset too. So it's exactly the opposite of what Ms. Wilson's saying now. The judge understood that there was a problem. Ms. Keeble understood there was a problem and both disregarded it. That's the reason for Redetti. Redetti and Hall, which I cited, indicated that deference is always given to the trial court with regard to custody, but it's not absolute. If an award of custody is contrary to the manifest way of the evidence, it's the obligation of the reviewing court to overturn it. Also, the appellate court has a duty to ensure that the record supports the trial court's decision. Here it clearly does not. A couple of things that Ms. Wilson referred to. First, she said that Mr. Wetzler worked a whole ton of overtime and nights. The testimony is exactly the opposite of it, so much so that Ms. Keeble admitted she was wrong in her original assessment. That's not true. She indicated that during the first year of life, Mom was a stay-at-home mom. That's not true. She went to cosmetology school every day, for which she got a job that she lasted a couple months at, then she was fired. She indicated that the most important factor was the relationship or the ability of the parties to facilitate a relationship. The only testimony evidence that ever comes out is things which my client did for the benefit of the child and Ms. Wilson. Ms. Wetzler didn't do any for the benefit of the child and Mr. Wetzler. And Ms. Keeble points to it when she says that's feathering his own nest. She changes it to say he's now feathering his own nest. So it's clear that even she understood that that's what was happening. She said that it was clear from all the testimony that Mr. Wetzler was disrespectful and demeaning. There is nothing in the record that indicates that. There is nothing in the record that indicates that Ms. Wetzler was taken off of medication, which the GAL found so severe, she called it a severe bout of depression, which affected her ability to care for the child. Those are factors which I think the court needs to take into account when it's talking about overtime to get into the child support issue. Mr. Wetzler testified, the only overtime I'm taking now is comp time. I'm not taking overtime in pay. So I get time off to spend with the child. I get my same pay. So the affidavit that he provided, which he said was his accurate record of his income, is exactly what the income showed. And the income showed that he should be paying $718 per month in child support at 20% rather than $900, which was ordered by the court. That's what was requested by the respondent. If the court looks at the evidence that's in there, it says 20% is $718. In addition to that, we focused on the debt. The debt which Mr. Wetzler was settled with was the debt for the condo in Florida, which he agreed to take, which was about $30,000 extra. The debt for the Chase bill, which was their business that they opened up, which was several thousand dollars. I think it was around $10,000. And then the court gives him the debt for her cosmetology loan, which she asked in her own position statement that she be awarded that debt. It gave that to her also. When you look at the numbers, Mr. Wetzler was, at the time of trial, was bringing in, netting about $3,500 a month. And Ms. Wetzler was netting about $2,600 a month. When she got $900 a month in support, she's getting $3,600 a month, and he's now getting $2,400 a month. The court then ordered him to pay $3,000 in attorney's fees. And I would point the justices to my case law that I cited, the Lee's case, which said that you've got to apportion those – I think it's – no, it's not Lee's case, I'm sorry. It's the Krimme case, which says you've got to – she's got to show, A, an inability on her part to pay her own attorney's fees, and an ability on Mr. Wetzler's part to pay her own attorney's fees. I asked her the question, you've got the ability to pay your own attorney's fees, don't you? She said yes. I asked her if she was paying rent, living at her folks'. She said no. It was included in her affidavit. Are you paying utilities? No. Are you paying a sewer bill? No. All those expenses that she listed as expenses of hers, she testified she wasn't paying and that she had the ability to pay her own attorney's fees. That statement alone indicates to the court that the court can't find she doesn't have the ability to pay. Therefore, the court should reverse that. Thank you. Okay. Thanks to both of you for your arguments this morning and the briefs, and we'll take the matter under advisement and provide you with a decision by July 14th. This is an expedited appeal, so we will get you an order as quick as possible. And that is the last.